Good morning, Your Honors. Stephen Shuman on behalf of the appellants, Manhattan Loft and Barry Shy. My clients, before embarking upon the project of converting most of this building from office building to residential, purchased two policies of insurance simultaneously. Purchased a primary policy with limits of $2 million, and they paid $1.4 million for that at the same time from the same agent. That's an extraordinary kind of insurance. It is. If you count the $2 million I pay in 1.4, they must have smelled a rat. Well, I wouldn't call it a rat. What they smelled was a construction project, and construction projects are notorious for resulting in claims and litigation. Nonetheless, that's an extraordinary ratio. It sure is, and it's an important point because it shows the connection between the primary coverage and the excess coverage. Now, are these rates negotiated individually depending on who the individual developer is? I don't have that knowledge. Okay. I just don't know. I know that from my client's point of view and from his testimony that he made the decision not to pay $1.4 million for a $2 million policy and then got up the next morning and bought an excess policy. What he did was he went to buy $12 million of insurance for $2 million. That's still pretty expensive compared to what we pay for our auto insurance policies and the corresponding limits. It's still known by the parties to be a risky venture going in, and that's relevant to the reasonable expectations of the parties. The next thing that's relevant is the fact this is a liability policy, liability in case you get sued. So you can look at this and say this is a project that could result in somebody getting sued and having a lot of liability, more than $2 million worth of liability. But this is not a duty to defend case. No, it is not. So we look at the actual coverage, not possibility of coverage. True, true. Although it's interesting, and I'll get to that, the way these cases come down when you have insurance, but when you have arbitration. But I'd like to start with the first issue of whether you have one determination or two under these two policies. The two policies bought together intended to be seamless coverage, and the primary policy not really being a very good business decision except for the excess policy. The ISOP policy, the excess policy that we're here on, says that the excess carrier will provide the coverage that Gemini, the primary carrier, would afford by increasing the policy limits to the combined amount. That is pretty clear language. What would Gemini afford if the policy limits were $12 million and not $2 million? And the evidence of what Gemini would do is found in the letter from their outside counsel, their coverage counsel. It says, ISOP, you need to pay this. You're saying that binds. It's over. That's that simple. That's right.  And remember, we're dealing with the start. What's your support for the position that ISOP is bound by a decision of Gemini that may or may not have been proper to pay? Because the ISOP policy. I think they made a mistake. They could have. ISOP nonetheless is bound. Right. I agree. That's our position. It's a follow-on policy, which, therefore, as I understand it, doesn't have its own separate terms. It simply incorporates the underlying terms. I disagree with that, Your Honor. It doesn't incorporate the underlying terms. What it says is. It does not. It does not. Very uncommon. What does follow-on mean? It's a follows-form policy. It can mean a lot of things. It's like I do a lot of lease cases, and triple net can mean a lot of different things. You have to read the actual contract to see what it says. The contract, the insurance policy that we're here on today, says additional coverage that Gemini would afford. It does not, does not incorporate the underlying policy. And let's look at. Just let me stop you. I want to hear that. But you're saying that because it says that coverage that Gemini would afford, if Gemini's lawyers make a terrible mistake and say, okay, let's toss the primary policy in, even though they didn't have to, because Gemini afforded that coverage improperly, you're saying ISOP has to follow on? ISOP has to pay the excess? That's right. Because that's what the policy says. Would you have any case law that says that? There appear to be treaties and cases going in the other direction, but I can't find any case law that supports your position or any treatise discussion of it that supports your position. As ISOP admits in their brief, there's little or no case law in this language. So you have no cases? There is no case law. Neither side can find case law that has this policy language. It's well and good that other policies incorporate the underlying policy. And that's where I was going to go. One of the cases they cited in their brief, this All State versus American Home Products, March 31, 2010 opinion, they say it's the same language. And in my brief, I made a mistake and said the opinion doesn't discuss the language. Actually, it does. In that case, it quotes the excess policy as saying, it's subject to the same warranties, terms, and conditions as are contained in or may be added to the underlying policy. There, Your Honor, is the language. That's incorporating the underlying policy. Very easy. Read that again for me, sir. This is – there's ellipsis in what I read. But this is the – this is not this case. This is a case they cited. This is the All State Insurance versus American Home Products case out of the southern district of New York. And it says the excess policy stated that they were, quote, subject to the same warranties, terms, and conditions. I mean, a break there. There's a lot of things that don't matter. And then continuing, as are contained in or may be added to the underlying policy. There is a typical following form policy. There are such things as following fortune policies. That's what our – how our policy is written. What's the language in your policy that tells us that ISOP is bound by the determination of Gemini that Gemini will pay? ISOP agrees to, quote, afford Manhattan such additional insurance as Gemini would afford by increasing the underlying policy limit, et cetera, to the combined $12 million. So you're saying afford the insurance means not only the policy but the determination of what the policy covers? Not quite. It's very easy to say we will give insurance on the same terms. We incorporate the terms of the underlying policy. We'll follow the underlying policy. The underlying policy controls. Say policy. Say underlying policy. They don't. So read it again. Afford Manhattan such additional insurance as Gemini would afford by increasing the policy limit to the combined amount. Yeah. Well, I think that language is susceptible to your reading, does not strike me as the most likely reading. If I were ISOP, it would be a cold day in hell before I would allow Gemini to determine that I'm on the hook for $10 million. Just because Gemini says so without Gemini suffering any of the consequences of it having to pay any part of that $10 million. Moreover, this is designated and described as a following form excess liability policy. And to those of us in this room, that might mean something. That's a legal term that lawyers and justices from the Ninth Circuit Court of Appeal may immediately have a light bulb going over their head and say, ah, I know what a following form policy is. I know what a following fortunes policy is. And they don't? ISOP? Oh, I'm sure ISOP does. But that's irrelevant. What's relevant is the, and this is California law. I'm sorry I don't have the case cited. It's in our brief. The technical legal terms that might mean something to a lawyer don't control. What controls is plain English. And the plain English that a non-lawyer who goes in and buys these two policies together and it says we're going to give you the same coverage as Gemini would afford. Yes, but your language, you're torturing the language, I think, to get to the result. It doesn't say that we're going to, if they say there's liability, we're going to pay it. It never, but Your Honor, it never, that's the insuring language. There is nothing, it's so easy for them to say we follow the policy. And I read the language that's apparently in most other policies. But why are you making the words as Gemini will afford. Would afford. Would have afforded. Would afford. Okay, would afford into as Gemini would pay. Additional insurance as Gemini would afford, I guess. Because it seems to me ISOP has the ability to decide that, to take the position that there was no need for Gemini to pay. That's the conclusion that would follow if the language incorporated the underlying policy. But it doesn't. And, Your Honor, as soon as you say that language is susceptible to our meaning, we win. Not really. Susceptible with torturing of the language, you lose. It seems to me that if you're going to have language construed in the way that you do, which to me would be a very surprising way, you've got to say it at least with some clarity. And, boy, it's not said. Let me move on to the next point. Good. The next issue, that would have been case dispositive. Got it. Here's another one. Let me give you another one that is case dispositive. I've been surprised before, but, boy, Vandenberg is right on point here. We've got a California Supreme Court case that says an insurer cannot look at an arbitration award and use that to show how the loss occurred and, therefore, deny coverage. It's right on point. So, if you follow Vandenberg, there's no evidence of a slab in this case, let alone that it caused smoke evacuation to be impossible, let alone that it shut down a bar or any of these things. And Vandenberg raises some complicated issues that I think... So what's, then, the premise for the payment? So where do I look as to what the underlying facts are? That is a fascinating question. Because if there are no facts, I don't think you get any money. Well, no, that's not... I don't think that works either. What happens is this. You have an arbitration demand that seeks property damage arising out of, you know, the purchase agreement. Okay? And, ultimately, that turns into a judgment. And under Vandenberg, you're going to have to have a trial to figure out how that happened. And I think that's why I said I think there's some interesting issues with Vandenberg. But we have more procedural background in this case that actually does us a great deal of good in showing that there is coverage. And here's how it works. The insured gets this demand for property damage under the purchase agreement. It's a sentence or two on this form demand, this AAA demand, although the arbitration ultimately ends up at jams. The arbitrator issues a lengthy award that looks like it's not under the purchase agreement. It looks like it's brought by the tenant under the lease. So I go to the L.A. County Superior Court and say to Judge Fruin, this arbitrator decided something that wasn't before him. He decided something under the lease that looks like it's a claim by the tenant. That wasn't submitted to arbitration.  I can't challenge the award based on errors of fact or errors of law at all. So all I can say is, to the Superior Court, is this award is not something that was within the arbitrator's jurisdiction. Well, the other side, of course, says, wait a second, Vandenberg talks about using it as collateral, as collateral estoppel, base of collateral estoppel. There's nothing in Vandenberg that talks about you can't use it as evidence. And the district court did not give it any preclusive effect pursuant to collateral estoppel. But, Your Honor, that was just a game that they played. If you'd rather talk over my question, I can't understand your answer, but go ahead. I'm sorry, Your Honor. The way they set the motion up in the separate statement says the arbitrator found X. We responded to the motion they filed and said, yes, the arbitrator did find that, but it's irrelevant, see Vandenberg. If they had said X is true and the evidence is the arbitration award and we're offering it for the truth of the matter asserted, then we simply say objection hearsay. Because the arbitrator didn't see a slab, doesn't know that it caused anything. He is – it's a written document by the arbitrator out of court, and he doesn't have personal knowledge anyways. It's not evidence of anything. And they didn't offer it as evidence of anything. So what ISOP is saying in that argument is, yeah, we brought the motion as a collateral estoppel motion. The arbitrator found X. Yes, we admit that's true. He did find X. That's what the reward says, but we say it's irrelevant. And then on appeal, they come in and say, well, you can affirm it because it's affirmative evidence of what happened. Well, no, it's not. It's hearsay. It's double hearsay. You didn't offer it for that. If you had offered it for that, we'd object it, and we'd put on an expert in response. We didn't respond to a motion that wasn't filed. The playing – to rule on that basis is to reach a result that's incorrect and to allow them to keep us from making an obvious and obviously well-founded objection through a procedural game. Okay. So let's pretend for the moment that I'm not going to pay any attention to the man behind the curtain. I'm not going to pay any attention to what evidence was presented during the arbitration. So what facts do I have? Any? Here's what you've got, the court of appeals opinion, and here's why it's important. Judge Fruin says your lost profits award is stricken. The arbitrator didn't have jurisdiction to award that. I'm waiting for facts. They're coming from the court of appeal. Okay. The court of appeal then says, yes, he does have jurisdiction. And here's the theory on which he had jurisdiction. I'm waiting for facts, not theory. Okay. Come on. The theory is that – because no one's going to look and see what the arbitrator's right or wrong. The arbitrator – it may ultimately turn out the arbitrator was wrong, but we still have coverage. I asked you a question. You have not yet answered it. Destroying the bar space. Destruction of the bar space is the covered claim. And so how do I know the nature of the facts that go into that claim? You would have to have a trial about those things. You can't just look at the arbitrator's award, and you certainly can't focus on the slab when the court of appeal says the reason there's jurisdiction for this is because there's a nexus between the destruction of the bar space, which the court of appeal points out is owned by the trust. And so you're saying you deserve to have a trial in the district court on the question as to whether or not the pouring of the concrete slab interfered with or made impossible the ventilation. Are you saying that? That's one of the things we're saying, yes. And are you saying – are you representing to me that, in fact, you're going to present evidence that it did not have that consequence? Oh, absolutely. In fact, if we have to, we'll get a – we'll get Smokovac and a permit to show that it didn't do that. It's – the arbitrator made all kinds of errors of fact and law. The point – the important point is when you have an arbitration award like this and the court of – and the California court struggles with it, part of it's the important part is thrown out and then reinstated for a reason. What's the reason that my client's being held liable legally? The court of appeal tells you there'd be the nexus between the purchase agreement, the agreement that's being arbitrated, and the award of lost profits damages is laid out in the court of appeals opinion and they have got a heading that's destruction of the bar space, not just the slab. The slab's in there. So what's your argument, then, as to why you're – why you get compensation from the arbitrator's award if I can't look at what the arbitrator looked at under the policy? I mean, where in the policy does it say you get reimbursed for an arbitrator's award? It doesn't. It says amounts you become legally liable to pay and it's a judgment. It becomes a judgment in the L.A. County Superior Court. They don't think there's any dispute that an arbitration award is covered. And that is problematic. I agree with Your Honor that there's a problem when you allow an arbitrator to issue an award and there's insurance for an arbitration award. And insurers could say, don't go to arbitration. We don't like what happens there. We don't like the fact that we can't rely on the awards. They could say those things. They don't. You get an arbitration award. It's confirmed as a judgment without a review of facts or law. And then California says you can't look at the award for – to determine coverage for the very reason that given that there's no review of the award for errors of fact or law, it's not fair to bind the parties to those findings in a different dispute. But let me ask a separate question. You held – your client held title to this property during the project, correct? Legal title, correct. Legal title. You could – I think at the end you turned it back to them for a nominal sum. You could – but you did hold title, correct? Legal title, you say. All right. Did you have the ability to evict them? No. Is that withheld in the lease? Yes. All right. If you held – In the purchase agreement, Your Honor, yes. Pardon? In the purchase agreement modifies the lease to do that, yes. Did you – if you held title, make your best argument as to why there isn't an exclusion under the provision for owning, renting or occupying. We weren't occupying it. We weren't renting it. Or it's destructive. Ownership would be the – Yes. Why is – It's not because ownership is defined under California Civil Code 654 as not as legal title, but as the right to possess and use and exclude others. And that lay in Andrew Myron's family trust and his entities. We had no right to do anything, really, at all. Even though you had legal title? Correct. We had no rights at all. You have some obligations flowing back and forth like you would with two condominium owners, have CC&Rs that govern their relationship. But we had – we couldn't sell it. We couldn't rent it. We couldn't enter it. We didn't get any rent. We had no indication of ownership. And if you take a look at what actually happened, undisputed testimony of the parties below, of the parties to the transaction, they would have liked to have had my clients buy the building and separate legal title. They couldn't do it right away because it was one legal parcel. You can't separate title. Why don't we hear from the other side? You've gone over. But we'll give you a chance to respond. Thank you. I think the record should show you went over because I asked a question at the end of your time. It wasn't your turn. And as you can see, I'm kind of a patsy. I let people talk. Yeah. Thank you, Your Honor. May it please the Court, Rebecca Weinreich for the Defendant, Insurance Company of the State of Pennsylvania.  It's the question about follow form versus follow the fortune. There is, in fact, California case law in it. There is California case law to the effect that if what the excess insurer provides is additional insurance, that's not the same as providing additional payments. It's not a blank check. California, is this case law in your briefs? It is. It's the Wells Fargo Bank versus Sega, the 1995 38-callot fourth case. And the quote there that I would draw the Court's attention to is when they're referring to what is covered and what is coverage, it says it refers to being insured against a specific risk or loss. Quote, it has nothing to do with collectability or the ability to take in payment. It's a contract. It's an insurance contract. It's not a check. It's not a deposit slip. Moreover, it has to include claim handling obligations because insurers in the State of California have nondelegable duties to adjust their claim. They simply are not allowed as a matter of law to say if someone else decides, that's good enough for us. That's the Hughes versus Blue Cross. Do you say this is in your brief? It is, Your Honor. The citation to, if you'd like, I can find the pages, but it's the Wells Fargo versus Sega case that we cite. Which brief is it in? Yes, sir. It is in our reply brief, docket number 23, the Wells Fargo case. I apologize, I misspoke. It is in the appellant's opening brief. It is cited at page 33. I'm sorry? It's in your brief? I misspoke. It's in, it's page 33 of the appellant's opening brief. Okay. You told us it was in your brief. I misspoke, Your Honor. I read you the correct quote from it and the correct citation. I just, I got the brief wrong. My apologies. I wonder why I couldn't find it. The quote that I just read to the, that says. Footnote 13. Correct. So in that case cited in footnote 13, the quote that, quote, it has nothing to do with collectability or the ability to take in payment, that is in the Wells Fargo case. So they cite it for one position. You cite it for another. I'm arguing it for another. Arguing it for another. Okay. All right. Go ahead. So in any event, the idea of follow the fortunes, counsel is suggesting that our policy should be considered a follow the fortunes policy. There is a creature called follow the fortunes. And in that creature, you are correct. I've never seen that creature. You say there is such a creature. Where do we find it? Typically in reinsurance settings. And the reason is a reinsurer owes no obligation to the insured. The reinsurer owes an obligation to the reinsured. It's essentially insurance for insurers. And in those settings, and we've cited both case law and treatises, that the reinsurer has to reimburse a reinsured, even in the circumstance where the reinsured. And that's not this case. Correct. It's reinsurance. Reinsurance has a whole separate set of rules. Exactly because the obligations don't run to the insured, they run to another insurance company. So follow the fortunes is irrelevant to our case. I certainly believe so. Yes, Your Honor. Turning then to counsel's comments that the underlying terms and conditions are not incorporated into ISOP, that is inaccurate. In the record, it's volume 2 ER110, which is the first page of ISOP's policy. Under conditions, it specifically says, quote, this policy is subject to the same warranties, terms, and conditions, except as otherwise provided as to the as are contained in or as may be added to the underlying coverage prior to the happening or accident. It specifically incorporates them. It has to. Otherwise, there would be no meat on this policy. It would be one page. It wouldn't identify anything. Except as otherwise provided means. ISOP is allowed to have its own endorsements if it wants to go to some additional place, which, in fact, it did in some instances, not particularly relevant to this conversation. But the form of the follow-form policy says we incorporate the underlying, except if we have a specific endorsement to the contrary that can expand or contract. That's as is otherwise provided. Yes. Otherwise provided. There's other pages to our policy. It's not just the one-page form. We have endorsements also. So the comment by the bench about it being a cold day in hell before ISOP starts I apologize. I take back those words. It would be an unlikely event. It would be a highly unlikely event, Your Honor. It would not be something the Department of Insurance would sanction, let alone our shareholders or our executors. We are obligated to do our own claim handling, including we are obligated to do our  And that takes us to the second point, which is that the Department of Insurance did not look at the same claim that we looked at. The reason we know that is, as the panel has already pointed out, Gemini was looking at a duty-to-defend case. They never evaluated coverage. They never evaluated occurrence. They certainly never evaluated whether the damages exceed $2 million. It simply wasn't on their radar. It's not their problem. They're a defense policy. They paid the property damage that they saw, 1.394. Wait. You said they only looked at it as a duty-to-defend case? They paid the 1.3. Yes. So they must have seen it as a duty to indemnify also? No. What they found was some property damage, and this is what the district court focused on also. Gemini did find some property damage that it believed was covered under its policy, and it paid 1.394 million on that. It paid about $307,000 in defense fees. It's not clear what the other roughly $250,000 or $300,000 was for. It certainly was not an analyzed coverage determination about things like lost profits or business, future business value. That just wasn't what Gemini was ever asked to do. So that's how we know they were looking at something different than we were looking at. Turning, if I could, to Vandenberg, the panel's correctly pointed out, Vandenberg says you cannot collaterally stop someone, which means they can offer evidence. I just heard counsel say he has all manner of evidence about the smoke evacuation. We haven't ever heard that. None of that's in the record. That's news to us, but we're about five years too late for that. That or some number of years too late. You tried to use the arbitration award as collateral estoppel, did you not? I did not, Your Honor. Respectfully, my obligation under Rule 56 motion is to offer some evidence, which I did. Vandenberg doesn't say the arbitration is inadmissible or irrelevant. It's some evidence. Burden shifts, then. It's the burden of the insured to bring this into the coverage in the first instance. They just don't object that it's all hearsay. It's not even some evidence? They didn't object to that. They said it was irrelevant. Okay. That's their position. I didn't write their papers. That's what they put in their papers. I've offered some evidence. Whether it carries the day depends on what factual evidence they put forth to dispute my evidence. The answer to that is zero. They put forth zero. To the panel's question about whether they are allowed to go back and argue about the findings of the arbitrator, of course they are. The California Supreme Court in J.C. Penney says, of course you can. You are free to go back and say, no, the wrong finding was below. That was a molestation, whether it was intentional or negligent. In any event, there is nothing precluding Manhattan Lofts from saying to the district court, no, Your Honor, the smoke evacuation wasn't a problem. There was a hole that it could go out, or the slab wasn't as thick as they make it out to be, or whatever they want to say. They didn't say anything. You can't win by simply not saying anything when the element is their burden. After all, they need to bring it into coverage in the first instance. If I can move forward, there were – there was a question near the end of counsel's arguments about the owning question, the question of whether he owned it or not. The one case that Manhattan Lofts points to saying we don't own it is the Vassa case. And what happened there is there, for a tax-exempt real property exchange, one of the primary obligations to his client is to hold title for 24 hours. And then, of course, give it back. That's a very different circumstance than what we have here. Manhattan Loft held legal title, certainly had the right to control and exclude others the way any landlord would. If I have an apartment, I have the right to be in my apartment. But if I bring noisy guests, or I create problems for the other tenants, or my landlord makes a mess, certainly my landlord can say that person can't come here anymore. Yes, but the ultimate test, it seems to me, is the right of eviction. And you heard your adversary say they did not have that. It's an interesting point because it wasn't raised below. If the trust could have held legal title in any sense, it would have done so. The testimony is uncontroverted that everybody in the underlying transaction wanted the trust to be able to hold it. It would have been illegal because the building hadn't yet been subdivided, the permits weren't in place, the white paper, and so forth. So the entire argument, my adversary's entire argument about ownership is we didn't own it because the trust must have had some ownership interest, notwithstanding that it is undisputed that it would have been illegal for the trust to have any ownership. That's completely circular. That can't be the case. He can't point to something that is a legal impossibility, ownership by the trust before the building is subdivided, to prove that he didn't own it. Moreover, again, back to Rule 56, he can't create an issue of facts by disagreeing with his own declarations. We set forth four or five declarations over the years in which Mr. Shai consistently testified over and over again under oath that he owned this building. That shifted only when he realized the implications of the truth on his coverage claim, which is if he owns it, it's out. There was a question about the scope of the coverage. My adversary commenced before we talked about the follow-form with the argument that he paid $1.4 million for $2 million worth of coverage or $2 million for $12 million worth of coverage. It's not that Manhattan Loft didn't get any coverage. In fact, Manhattan Loft got very broad and expansive coverage for a different kind of claim. He bought this policy to protect himself against future lawsuits by the HOA and the eventual purchasers of these units. If they come back and say it leaks, the electrical is no good, whatever the problems are. He had a 10-year tail for construction defect claims to be brought by subsequent purchasers. Not only did he have a 10-year tail, which is significant, ISOP actually deleted a lot of the exclusions that would otherwise have taken those future HOA claims out of coverage. The Your Work exclusion was removed by Endorsement 27. The future HOA owners are allowed to have the claim because they removed the exclusion for property that you sell, transfer, or abandon. This policy does provide $10 million worth of coverage, but not for this claim. This isn't the claim that's covered by this policy. If you knew sort of this is practice within the industry, and you may or may not be able to address the Gemini claim, or rather policy, are these policies negotiated individually depending on who the developer is, the record of the developer, and so on? Absolutely, and although it wasn't directly relevant to this motion, our underwriter 30B6 was put up for deposition for a full day, maybe even two days. She's mentioned in the record her deposition wasn't attached. Manhattan Loft had different brokers. Sterling was one, and Cromwell was the other, I believe, for Gemini and for ISOP. These are all negotiated terms, absolutely. So a different developer for what looks like the same policy might have paid something else? Absolutely. You have very detailed loss runs. I mean, the underwriting files are pretty detailed and maybe a little dry, but there's a lot of information in there. I want to touch on, if I may, the exclusion, the project exclusion also, because this was the other one that the district court found against us on the project exclusion, and the finding was the word project is ambiguous, and just to not pound it too hard, but, of course, ambiguity can't ever be in a vacuum. The California Supreme Court, in Powerine and many other cases, has said, it's not ambiguous just to torture one word out here in space. You need to look at the facts of this case, the words of this policy. It needs to be ambiguous in this setting, and then you still have a three-step test, the Bay City pavings, reasonable expectations of the insured, and so forth. You don't just jump right to ambiguity. Counsel's argument is that the word, quote, project didn't refer to the building. It referred to the construction work that was being done. So counsel argues there's two projects. There's a project out there where condominiums are being constructed, and there's a project out there where the first floor space is being developed into a bar. That's directly contrary to the words of the policy itself. The endorsement at issue here, and you can find it in volume three of the record at page 179, it says that project includes but is not limited to buildings, structures, supplies, material, equipment. It has a list. It also says construction, the word construction includes but is not limited to construction, renovation, rehabilitation, demolition, excavation. The word construction refers to activities. You're doing something. You're demolishing something. You're renovating something. The word project refers to the building. The reason the policy – it's quite obvious. The reason the policy excludes property damage at the project, at this building, is those are not the claims that we're paying. The claims that we would pay would be bodily injury, property damage next door, if he knocks his HVA system off the roof and it damages the building next door, for example, or what it's really made for, 10 years' worth of assumed HOA claims that are going to be coming in for leaky pipes and bad electrical and so forth. The last thing I want to say, and then if I may just reserve the last three-and-a-half minutes for rebuttal, is – Oh, you got to cross the bill. Yeah. Yeah. I'm sorry. Okay. Is the – even if we were wrong on these, which I don't think we are, certainly this conversation illuminates that we were more than reasonable and that would eliminate the bad faith claim. And even if that were not the case, the district court separately evaluated and eliminated the punitive damage claim. Not as a result of it being derivative, but separately because of the clear and convincing burden that sits on the insured in this setting. I must admit I never thought I'd hear a case involving Juan Marichal hitting John Roseborough over the head with a bat. Well, we have my adversary to thank for that. I have a lot to say about it, but if it didn't come up, I'll save it for rebuttal. It's a good thing we're all over 50. I did pick the example based on – I figured – Put two minutes on the clock, please. Let me focus on Vandenberg for a moment. If you rule against us on the slab issue, we will have been cheated terribly. Look at that separate statement. Look at the separate statement and see what they put down. They didn't put down the slab block, the smoke evacuation. If they put that down, I know to put on evidence on that. When they argue based on the arbitration award, the arbitrator found X. The arbitrator found the slab block, the smoke evacuation. The arbitrator found this. Those are their facts. We can't deny those facts. Those are the arbitrator's findings. We said we admit them. I think I read Vandenberg correctly to say, okay, that's what the arbitrator did. Putting that in is evidence as to what happened. And then it's up to you to say, but that's not what happened. No, it's not what Vandenberg says at all. And remember, this isn't a simple evidence question. But you put in nothing, correct? I put in nothing because it wasn't raised. If they had put down in their separate statement, undisputed fact number one, the slab block, the smoke evacuation. Evidence of that in the right column, the arbitrator's statement at page 3, line 8. I would have said two things. Objection hearsay. It's double hearsay. The arbitrator is writing what he heard, non-verified, et cetera, statement, out of court. And second of all, declaration of Barry Schei, who's a contractor, and I would have found another expert to say, not true. And in fact, we would have gotten, if we wanted to, we can get the smoke evac for that property. And your answer was that's all irrelevant. Irrelevant to what? It was irrelevant to the motion because they didn't say, because the way they framed their motion was the arbitrator found these things. That's true. They put that as a fact. And it is a fact. The arbitrator found what it says in the award. Then they come back to the court of appeal and say, well, too bad for you. You're procedurally barred because you should have put on evidence for a fact that we didn't say was undisputed. They changed from a motion that was based on collateral estoppel, which is invalid, to a motion that's based on the merits, what actually happened, without giving us a chance to change our response. And we've got a simple and obvious response. The hearsay objection is well taken. But we don't make it because it's not offered for the truth of the matter asserted. The award was offered to prove what the award says. And they made arguments that that was relevant. We said, sure, we admit that it says that. We think that the fact that it says it's irrelevant. We have in our heads, we have in our papers that Vandenberg says you can't do this. And then they're going to come back to the court of appeal and say, well, guess what? In the court of appeal, we're going to treat this as a motion based on what actually happened. And too bad for you, Manhattan Loft, you don't get to put on evidence. You don't get to make your obviously valid objection. You just lose. That's really unfair and hyper-technical. And I can represent as an officer of the court, it's my belief you can get Smokaback right now, that there's no truth to it and never was. And if I couldn't prove that, it doesn't do me any good. Give me a chance to say, objection here saying, give me a chance to put on my evidence. But there's an intellectual conundrum here then. Okay, so you have this award. You're trying to get insurance compensation for the award. Right. And it seems to me you're now defending on saying nothing happened for which there should have been an award. And this is not an assured event. This is Vandenberg. This is exactly the problem in Vandenberg. Let me give you another example. Car crash. I get in a car accident or I allegedly get in a car accident. My defense is I wasn't there. I was in Bali. The court finds, the court, not even an arbitrator. The court finds I was here and I was negligent and I drove my car. There's coverage. The insurance company can't come back and say, well, you know what, Mr. Schuman, you said you weren't negligent. You said you had no liability. In fact, you said you were in Bali at the time, so you lose. You know, it really does become more problematic in Vandenberg. I agree with you because the arbitrator in Vandenberg, the actual case, finds that there was a quick gas leak in these underground storage tanks. Not covered under that policy. Slow leaks were covered. Wouldn't be surprised if we read the transcript of the arbitration if the tenant didn't say, hey, there was no gas leak at all. There wasn't any leak. Okay. Thank you. What do you do? You've got to do something. We got an important takeaway point is we got cheated. We didn't get a chance to put on our evidence. Give us a chance, we'll check. Okay. All right. Thank you. He's had years' worth of chances. This is the first we're hearing that the smoke could have gotten out. JCPenney, California Supreme Court, no preclusive event. You are allowed to offer counter evidence. If you were in Bali, come forward with your passport and your visa. Prove it. That's what the California Supreme Court tells us to do. With regard to the eviction, there is a question about the eviction. I would point to Volume 4 of the record, page 700, is Manhattan lost? Notice to quit. He's trying to throw out a tenant. This is the spirited Venture 5, which was the related entity to the trust. You see their name kind of weaving through. Obviously, if he thought he could evict them, he knew he owned the building. There is simply no evidence in the record that he didn't raise the hearsay objection with regard to the arbitrator's award. We offered it. It is some evidence. He can come back with the analog to his visa from Bali to show that the smoke could be evacuated. On the occurrence, I would bring the Court's attention to two very recent cases, one that just came down within the last two weeks. They're both USDC California cases. They both find that the construction work is not an occurrence. The one that came down a couple of weeks ago, Paquette Construction, and the earlier one, Osborne Development, they both say it doesn't even matter whether the contractor or whoever built it foresaw the damages he was going to cause. If you built it, it is not an accident. It is not an occurrence. There is no coverage in those cases. So if there are any questions, I'd be delighted. Otherwise, I am amazingly 50 seconds ahead of schedule. Okay. Thank you very much. Thank you, Your Honor. Thanks, both sides, for your arguments. Shy and Manhattan Loft versus Insurance Company of the State of Pennsylvania, now submitted for decision. That completes the calendar for this morning, and we're now in adjournment. Thank you.
judges: Stein, Trott, Fletcher